866 F.2d 97
 29 ERC 1227, 19 Envtl. L. Rep. 20,727
 SOUTH CAROLINA DEPARTMENT OF WILDLIFE AND MARINE RESOURCES;
National Wildlife Federation; South Carolina
Wildlife Federation; Georgia Wildlife
Federation, Plaintiffs-Appellees,
v.
John O. MARSH, in his official capacity as the Secretary of
the Army; Elvin R. Heiberg, III, General, in his official
capacity as Chief of Engineers for the Department of the
Army; C. Ernest Edgar, III, in his official capacity as
Division Engineer; Colonel Stanley G. Genega, in his
official capacity as District Engineer, Corps of Engineers,
Defendants-Appellants.
 No. 88-2840.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 8, 1988.
Decided Jan. 24, 1989.
 
 Michael Paul Healy (Roger J. Marzulla, Asst. Atty. Gen., Myles E. Flint, Deputy Asst. Atty. Gen., Fred R. Disheroon, Jacques B. Gelin, Land & Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., Vinton D. Lide, U.S. Atty., R. Emery Clark, Asst. U.S. Atty., Columbia, S.C., on brief), for defendants-appellants.
 Ellison D. Smith, IV (E. Jeannette Heyward, Smith and Bundy, Charleston, S.C., Buford S. Mabry, Jr., South Carolina Wildlife and Marine Resources Dept., Columbia, S.C., David J. White, Nat. Wildlife Federation, Atlanta, Ga., on brief) for plaintiffs-appellees.
 Before WILKINS, Circuit Judge, HOWARD, United States District Judge for the Eastern District of North Carolina, sitting by designation, and MERHIGE, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 WILKINS, Circuit Judge:
 
 
 1
 The South Carolina Department of Wildlife and Marine Resources, joined by the South Carolina, Georgia, and National Wildlife Federations (Plaintiffs), brought suit against the United States Army Corps of Engineers (the Corps) alleging violations of the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C.A. Secs. 4321, et seq. (West 1977). The Corps appeals from the district court issuance of a preliminary injunction prohibiting it from proceeding with the installation of pumped storage facilities at the Richard B. Russell Dam (the Dam). We affirm in part, vacate in part, and remand to the district court.
 
 I.
 
 2
 The Corps currently plans to install and ultimately to operate pumped storage generators at the Dam, which is located between South Carolina and Georgia on the Savannah River. Pumped storage generators can be used at a hydroelectric dam to refill the upstream reservoir following the release of water for the generation of electricity. Turbines attached to reversible generators draw water from the tail waters below a dam and pump it through penstocks into the upstream reservoir during periods of low electricity demand. During periods of high electricity demand the turbines and generators reverse direction and the force of the water flowing down through the penstocks is used to generate hydroelectric power. Pumped storage generators are more expensive than conventional generators, which are not reversible and operate only in a generating mode, but they can function conventionally if not used to pump water upstream. Pumped storage poses a major environmental concern because of the risk that while operating in the pumping mode the turbines may "entrain," or kill, large numbers of fish and fish eggs. There is less concern over possible entrainment in the generating mode.
 
 
 3
 When construction of the Dam was authorized by Congress as part of the Flood Control Act of 1966, Pub.L. No. 89-789, Sec. 203, 1966 U.S.Code Cong. & Admin.News (80 Stat. 1405) 1632, 1648, the installation of pumped storage generators was specifically prohibited. However, when Congress deleted this prohibition by enactment of the Water Resources Development Act of 1976, Pub.L. No. 94-587, Sec. 182(a), 1976 U.S.Code Cong. & Admin.News (90 Stat.) 2917, 2940, the Corps decided to proceed with the investigation and installation of pumped storage facilities at the Dam.
 
 
 4
 Before construction of the Dam began in November 1974, the Corps was required under NEPA to prepare a detailed statement on (1) the environmental impact of the Dam; (2) any adverse environmental effects which could be avoided; (3) alternatives; and (4) "the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity." 42 U.S.C.A. Sec. 4332(2)(C). The original impact statement for the Dam, published by the Corps in May 1974, did not address the possible environmental effects of pumped storage since that system was expressly prohibited at that time. When Congress removed the prohibition the Corps addressed the consequences of pumped storage in an impact statement published in 1979 (1979 EIS) and submitted to Congress in 1981.
 
 
 5
 On May 22, 1984 the Corps awarded its first contract for construction of pumped storage facilities at the Dam. Then in February 1988, before construction commenced, the Corps announced that it intended to prepare a supplemental environmental impact statement (SEIS) regarding mitigation of the adverse effects of pumped storage. The Corps decided not to delay installation of the pumped storage facilities for the two years it would take to complete the SEIS, and awarded the final installation contract in April 1988.
 
 
 6
 Plaintiffs instituted this action a few days before the Corps awarded the final installation contract, seeking declaratory and injunctive relief. They moved for a preliminary injunction to prevent the Corps from installing the pumped storage facilities prior to completion of an environmental impact statement that adequately considers the potential entrainment problem and addresses the various options for mitigating this and any other environmental risks. In support of the injunction Plaintiffs argued that the Corps must be prevented from installing pumped storage generators prior to completion of an adequate impact statement to preserve the option of not installing them. They asserted that once the money is spent and the pumped storage equipment is installed, the economic considerations in favor of operating it in both the generating and pumping modes will be too high to resist regardless of the environmental impact. Plaintiffs did not contend that the installation of pumped storage generators alone would have any adverse environmental impact.
 
 II.
 
 7
 The standard for issuance of a preliminary injunction is the balance-of-hardship test stated in Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189 (4th Cir.1977). Under this test a district court must consider (1) the likelihood of irreparable harm to a plaintiff without an injunction, (2) the likelihood of harm to the defendant with an injunction, (3) the plaintiff's likelihood of success on the merits, and (4) the public interest. The factual findings of a district court on these factors must be accepted unless clearly erroneous. Capital Tool & Mfg. Co. v. Maschinenfabrik Herkules, 837 F.2d 171, 173 (4th Cir.1988). The balancing of the factors and ultimate decision to grant or deny preliminary injunctive relief may be reversed "only if an abuse of discretion is shown." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bradley, 756 F.2d 1048, 1055 (4th Cir.1985).
 
 
 8
 The district court determined that it was likely that the 1979 EIS inadequately considered the risks of pumped storage because the Corps did not address all the possible problems such a system could cause, especially the problems revealed by a test at a Missouri pumped storage facility in 1982. It then concluded that Plaintiffs had demonstrated a sufficient likelihood that they would prevail on the merits of their claim that the Corps had failed to comply with NEPA. The court also found that the potential harm to the Corps from an injunction, which would be substantially higher costs, "by no means equates to the loss the environment and general public will suffer if the fisheries at the [Dam] are lost." Finally, the court noted that the public interest was best served by a preliminary injunction.
 
 
 9
 The district court did not clearly err in finding that Plaintiffs were likely to prove that the 1979 EIS was inadequate to meet NEPA requirements concerning the environmental risks of operating pumped storage generators at the Dam. It also did not abuse its discretion in determining that the balance of hardships favors Plaintiffs and in deciding to enter a preliminary injunction. As the Supreme Court has observed:
 
 
 10
 Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.
 
 
 11
 Amoco Production Co. v. Gambell, 480 U.S. 531, 545, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987).
 
 III.
 
 12
 The scope of the injunctive remedy imposed by the district court was, however, broader than necessary to protect against the environmental risk. "Whenever the extraordinary writ of injunction is granted, it should be tailored to restrain no more than what is reasonably required to accomplish its ends." Consolidation Coal Co. v. Disabled Miners of Southern West Virginia, 442 F.2d 1261, 1267 (4th Cir.), cert. denied, 404 U.S. 911, 92 S.Ct. 228, 30 L.Ed.2d 184 (1971). This is particularly so when preliminary injunctive relief is granted. Id. The Corps has already spent a majority of the funds allocated for the project, and Plaintiffs conceded at oral argument that installation alone of the already purchased pumped storage generators will cause no environmental damage. Accordingly, since restraining the installation of the generators is not reasonably required to protect the environment, we vacate that part of the injunction which prohibits the Corps from installing the pumped storage generators at the Dam.
 
 
 13
 We also conclude that the district court properly found that operation of pumped storage generators at the Dam prior to the completion of the SEIS by the Corps may create a substantial risk of harm to the environment. Further, it is not clear that the operation of pumped storage generators only in the generating mode is environmentally sound. Therefore, since the prohibition of installation of the pumped storage generators necessarily included enjoining their operation, we affirm the injunction to the extent it prohibits the Corps from operating or testing the pumped storage generators, once installed, until further order of the district court.
 
 IV.
 
 14
 The Corps is fully aware that even if the pumped storage facilities are installed, they may never be allowed to operate. There is a substantial possibility that their operation, at least in the pumping mode, will never be environmentally sound. And the Corps undoubtedly recognizes this distinct possibility for it has stated both to the district court and to this court that these facilities will not be operated to the detriment of the environment.
 
 
 15
 The decision to install pumped storage facilities at the Dam may ultimately prove to be economically unsound for they may never be allowed to operate. Nonetheless, installation alone will cause no environmental damage, and while the potential for financial waste may prove more real than the financial savings gained by simultaneously proceeding with installation and environmental study, this decision is one Congress has charged the Corps with making.
 
 V.
 
 16
 We remand to the district court for further supervision and appropriate proceedings. The district court will retain its discretion to enforce, modify, or dissolve the injunction based on its review of the circumstances as they develop.
 
 
 17
 VACATED, IN PART; AFFIRMED, IN PART; AND REMANDED WITH INSTRUCTIONS.