**STATE OF NORTH CAROLINA; Roanoke River Basin Association, Plaintiffs–Appellees,**

v.

**CITY OF VIRGINIA BEACH, Defendant–Appellant.**

No. 91–2314.

United States Court of Appeals, Fourth Circuit.

Argued April 11, 1991.

Decided Dec. 6, 1991.

As Amended Jan. 7, Jan. 13, and Feb. 12, 1992.

John F. Kay, Jr., Mays & Valentine, Richmond, Va., argued (M. Scott Hart, George A. Somerville, Samuel M. Brock, III, Mays & Valentine, Richmond, Va., Leslie L. Lilley, City Atty., Jeffry A. Sachs, Asst. City Atty., City of Virginia Beach, Virginia Beach, Va., John R. Jordan, Jr., Robert R. Price, Jordan, Price, Wall, Gray & Jones, Raleigh, N.C., on brief), for defendant-appellant.

Alan S. Hirsch, Sp. Deputy Atty. Gen., Raleigh, N.C., Patrick M. McSweeney, McSweeney, Burtch & Crump, P.C., Rich-

mond, Va., argued (Lacy H. Thornburg, Atty. Gen. of North Carolina, Timothy D. Nifong, Asst. Atty. Gen., Raleigh, N.C., Michael V. Hernandez, Richmond, Va., on brief), for plaintiffs-appellees.

Before HALL, MURNAGHAN, and NIEMEYER, Circuit Judges.

## OPINION

NIEMEYER, Circuit Judge:

Once again we are confronted with the long-running dispute over the use of the waters of Lake Gaston, a man-made lake which lies partly in Virginia and partly in North Carolina, in the basin of the Roanoke River. The City of Virginia Beach, Virginia, which is situated in the James River Basin, seeks to satisfy its potable water needs by building an 85-mile pipeline extending from Lake Gaston to Virginia Beach through which it can withdraw up to 60 million gallons of fresh water per day. The State of North Carolina and the Roanoke River Basin Association (collectively hereafter, North Carolina)[1] oppose the proposed diversion of water from the Roanoke River Basin, because they argue it will create a potential shortage there and stifle future development in the basin.

Although Virginia Beach has obtained a permit for construction of the pipeline from the Army Corps of Engineers, which was affirmed by the district court in *North Carolina v. Hudson*, 731 F.Supp. 1261 (E.D.N.C.1990), and by us in *Roanoke River Basin Ass'n v. Hudson*, 940 F.2d 58 (4th Cir.1991), it has not obtained approval from the Federal Energy Regulatory Commission (FERC), which is the licensor of the hydropower facility at Lake Gaston and the immediately surrounding land, known as FERC Project 2009.

On North Carolina's motion, the district court issued an injunction against Virginia Beach on December 10, 1990, that prevents it from commencing construction of any part of the pipeline project until the necessary approvals are obtained from FERC and until FERC has completed its environ-

mental review. Relying on our decision in *Maryland Conservation Council v. Gilchrist*, 808 F.2d 1039, 1042 (4th Cir.1986), the district court concluded that any construction including even that outside FERC's jurisdiction, would impose public and political pressure on FERC to the point of usurping its ability to make a reasoned and independent environmental evaluation. The court also denied Virginia Beach's motion to alter or amend the injunction to allow Virginia Beach to proceed with two relatively small portions of the project outside of FERC's jurisdiction which are critical to maintaining a schedule and saving expense. From the district court's orders granting the injunction and denying the modification, this appeal is taken.

We are now presented with the questions of 1) whether the interest of FERC in approving changes at the hydropower facility at Lake Gaston (Project 2009) justifies an order prohibiting construction of other portions of the pipeline solely on the ground that FERC's review would improperly be influenced, and 2) whether FERC's intent to conduct an independent environmental review beyond its jurisdiction justifies an injunction prohibiting construction of those portions of the pipeline project not within its jurisdiction. Without reaching the question of whether all construction outside Project 2009 can proceed, we hold here that the commencement of construction of two relatively small portions of the pipeline project outside FERC Project 2009 does not apply such public and political pressure on FERC that it will be unable rationally to discharge its statutorily imposed responsibilities and that this construction will not interfere with FERC's responsibility in conducting an environmental review on other parts of the pipeline. Accordingly, we reverse the court's refusal to modify the injunction, without reaching the question beyond that modification of how much construction is too much.

## I

Although the City of Virginia Beach, which is the most populous city in the State

---

1. The Roanoke River Basin Association includes as members individuals, business entities, and

political subdivisions in the basin, from both North Carolina and Virginia.

of Virginia, borders the lower Chesapeake Bay and the Atlantic Ocean, it has for many years suffered from fresh water shortages.[2] At various times in the past decade, water-use restrictions and water rationing have been imposed, and with the unexpectedly rapid population growth of the Virginia Beach community, the shortage grows more severe. Virginia Beach does not have a water supply of its own, and it has had to purchase its water from the City of Norfolk under a contract that obligates Norfolk only to provide Virginia Beach with "surplus" water. That contract expires in 1993. After exploring various options for alleviating the problem, such as desalination of sea water and wastewater reuse, Virginia Beach concluded that the best solution was to draw water through a pipeline from Lake Gaston.

Lake Gaston was created by construction of a dam on the Roanoke River for use as a hydropower project. The project was constructed in the 1950's by Virginia Power Company (VEPCO (formerly the Virginia Electric & Power Company)) under a license obtained from FERC[3] to construct, operate, and maintain the facility (Project 2009). VEPCO owns the hydropower generation facility and surrounding land that is included in Project 2009. Consequently, to obtain water from Lake Gaston, Virginia Beach must obtain easements from VEPCO to cross its land and VEPCO must obtain approval from FERC. North Carolina contends that VEPCO must also obtain a modification of its license from FERC to permit Virginia Beach to draw water from Lake Gaston.

In July 1983, Virginia Beach applied for a permit for the construction of the pipeline project from the Army Corps of Engineers, pursuant to 33 U.S.C. § 403 (1988). The pipeline project, which would lie wholly in the State of Virginia, would include six overhead river crossings, a pump station near Lake Gaston, and intake structures in and near the lake. The total cost of the project has been estimated at $218.9 million.

In December 1983, the Corps issued an Environmental Assessment (EA) and a Finding of No Significant Impact (FONSI), which concluded that there would be no significant impact on the quality of the human environment as a result of the pipeline project. Thus the Corps concluded that an Environmental Impact Statement (EIS), otherwise mandated by the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C) (1988), was not necessary. After a 30–day public comment period, the Corps issued a permit to Virginia Beach for the pipeline project.

Virginia Beach then, in 1984, approached VEPCO to obtain approval from FERC. VEPCO, however, declined to initiate the application to FERC until the permit from the Corps had been affirmed by the district court.

The issuance of the permit spawned two lawsuits. In the first, filed in the Eastern District of Virginia, Virginia Beach sought a declaratory judgment that the Corps' permit was valid. On appeal of an interlocutory order entered in that case, we held that the district court in Virginia had no personal jurisdiction over the Governor of North Carolina, who had been named as a defendant. *City of Virginia Beach v. Roanoke River Basin Ass'n,* 776 F.2d 484, 488 (4th Cir.1985). That case was thereafter transferred to the Eastern District of North Carolina where the second lawsuit, which was filed by the State of North Carolina and the Roanoke River Basin Association and challenged the issuance of the permit, was pending. The case transferred from Virginia was later dismissed when Virginia Beach was allowed to intervene in the North Carolina case and raise the same arguments it had made in the transferred case.

---

2. The situation is suggestive of that irony often lamented:
   "Water water every where,
   Nor any drop to drink."
   Samuel Taylor Coleridge, *The Rime of the Ancient Mariner* (1798), pt. II, st. 9.

3. The license was first issued by the Federal Power Commission in 1951, and on October 1, 1978, FERC succeeded the Federal Power Commission pursuant to the Department of Energy Act, 42 U.S.C. § 7172(a)(1)(A) (1988).

The district court issued two published opinions, *North Carolina v. Hudson,* 665 F.Supp. 428 (E.D.N.C.1987) (*Hudson I*), and *North Carolina v. Hudson,* 731 F.Supp. 1261 (E.D.N.C.1990) (*Hudson II*), the final effect of which was to reject North Carolina's challenge to the Corps' permit and to refuse to require that an EIS (environmental impact statement) be prepared. We affirmed the district court's ruling in *Roanoke River Basin Ass'n v. Hudson,* 940 F.2d 58 (4th Cir.1991), concluding that "[t]he Army Corps of Engineers properly considered all factors that it was required to consider before issuing a permit." 940 F.2d at 66.

After the district court decided *Hudson II,* but prior to our affirmance, Virginia Beach began the process of preparing an application, through VEPCO, to obtain FERC's approval of the grant of easements from VEPCO for use of the property within Project 2009. It also decided to commence construction of the portions of the pipeline project that were not under FERC's jurisdiction and awarded contracts toward that end. North Carolina, having learned that construction would commence on December 10, 1990, filed another suit on November 30, 1990, in the Eastern District of North Carolina for a preliminary and a permanent injunction to prohibit any construction of the pipeline pending approval by FERC. Ten days later the district court issued an injunction and a final decision on the merits prohibiting construction of any part of the pipeline project until FERC has approved "the application by VEPCO for the Non–Project Use of Project Lands and Waters." [4] Virginia Beach thereafter filed a motion to amend the injunction to allow it to proceed with what Virginia Beach considered two "critical path" tasks to keep the project reasonably on schedule: 1) six overhead river crossings and 2) certain portions of the pump station. Together, these tasks represented an estimated completion cost of $8.4 million. By beginning work on the critical path tasks immediately, Virginia Beach argued, invaluable time would be saved in completing the entire pipeline project and the potential for a severe water shortage could be lessened. The district court denied the motion, and this appeal followed.

## II

Virginia Beach contends that there is no basis to enjoin pipeline construction outside the jurisdictional bounds of FERC Project 2009, which includes the hydropower facility and immediate environs at Lake Gaston licensed by FERC to VEPCO. It notes that the Army Corps of Engineers has already conducted an environmental review under NEPA for the remainder of the pipeline project, including the proposed critical path tasks at issue here, and the Corps' conclusions were approved by the district court. Virginia Beach further points out that it has already spent $18.1 million on the project and that the expenditure of an additional $8.4 million is insignificant compared to the overall project's estimated cost of $218.9 million. Although the expenditure of $8.4 million is relatively minor and Virginia Beach is apparently willing to forego it if FERC approval is not obtained, Virginia Beach points out that by proceeding with the critical path tasks at this time, it will avoid potential penalties on construction contracts already awarded and will save 12 to 15 months in overall project time should FERC give its approval. It notes that during three past droughts (in 1976–77, 1980–81 and 1986–87), the citizens of Virginia Beach were subjected to mandatory water-use restrictions and water rationing. Moreover, the population of Virginia Beach has grown significantly since those droughts, and Virginia Beach argues that, without progress on the project, the risk of a severe water shortage will increase significantly. It points to the district court's finding that "the possibility of hardship to [Virginia Beach's] citizens in the event of a drought is real." J.A. 400.

North Carolina contends that Virginia Beach is not authorized to commence con-

---

4. The court noted "that the facts are undisputed and that all arguments that could have been presented to the court have been and that, there-fore, this decision is a final one on the merits of the action." J.A. 402 n. 4.

struction of any portion of the pipeline project that lies within the Gaston Reservoir boundary (Project 2009) until FERC has approved VEPCO's application. Moreover, it contends that FERC can only approve VEPCO's application after it conducts an environmental review of the entire pipeline project. It argues that if Virginia Beach is allowed to begin construction before this approval, the large expenditures of money by Virginia Beach will improperly influence FERC's decision on whether to approve VEPCO's application, in violation of the principles stated in *Maryland Conservation Council v. Gilchrist*, 808 F.2d 1039 (4th Cir.1986). It also argues that damage done to the environment by construction not approved by FERC will be irreparable.

The district court, relying principally on our decision in *Gilchrist*, 808 F.2d at 1042 ("We are committed to the proposition that when a major federal action is undertaken, no part may be constructed without an EIS [Environmental Impact Statement]."), agreed with North Carolina and enjoined all further construction stating:

> The court holds, however, that the public interest in a FERC decision uninfluenced by the vast expenditures of public funds and a partial completion of the project outweighs any anticipated delay. The public interest favors avoiding irreversible damage to the environment, ... even though compliance with NEPA may result in delays and cost increases.

(citations omitted). J.A. 403. In denying the motion to modify the injunction to authorize construction of the two critical path tasks lying outside Project 2009, the court added:

> As this court interprets *Gilchrist*, federal regulatory agencies, such as FERC, should not be presented with public and political pressure brought on by partially completed projects in making important environmental decisions.... Defendant has already spent $18.1 million on this project. Although $8.4 million may be a small part of the total $218.9 million price, it at least becomes *more signifi-*

*cant* when added to the $18.1 million already spent.

(emphasis in original). J.A. 589. Virginia Beach contends that both rulings were legally erroneous.

In reviewing an injunctive order, we accept the factual findings of the district court unless they are clearly erroneous. *South Carolina Dep't of Wildlife & Marine Resources v. Marsh*, 866 F.2d 97, 99 (4th Cir.1989). The district court's application of legal principles, however, presents a legal question that is reviewed *de novo*. *See Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 193 (4th Cir.1977) (review of lower court's application of the law not limited by the "clearly erroneous rule" governing questions of fact). Thus, while we must give due regard to the factual findings made by the court below, the application of the holding in *Gilchrist* to those facts is a question of law which we will review *de novo*.

In *Gilchrist*, Montgomery County, Maryland, planned to build a highway through a state park which had been created with federal funds from the Department of the Interior. Various groups challenged commencement of construction, even of portions of the project that lay outside the park, before an environmental review required by NEPA was completed. The district court dismissed the claim and on appeal we reversed, stating:

> Because it is inevitable that the construction of the highway will involve a major federal action, it follows that compliance with NEPA is required before any portion of the road is built.... The decision of the Secretary of the Interior to approve the project, and the decision of any other Secretary whose authority may extend to the project, would inevitably be influenced if the County were allowed to construct major segments of the highway before issuance of a final EIS. The completed segments would "stand like gun barrels pointing into the heartland of the park." ... It is precisely this sort of influence on federal decision-making that NEPA is designed to prevent. Non-federal actors may not be

permitted to evade NEPA by completing a project without an EIS and then presenting the responsible federal agency with a *fait accompli.*

*Gilchrist,* 808 F.2d at 1042 (citations omitted). We then remanded the case to the district court to determine whether, in fact, the project would violate NEPA "by limiting 'the choice of reasonable alternatives' available to federal decision-makers." *Id.* at 1043 (citing 40 C.F.R. § 1506.1(a)(2) (1985)).

North Carolina relies on *Gilchrist* to argue that if construction of any part of the pipeline is allowed to go forward, an enormous amount of public and political pressure will be put on FERC to approve the project, and FERC will be unable to make a reasoned and independent decision regarding the effects of the pipeline project and the water withdrawal on the human environment and hydropower generation at Lake Gaston.

■ Nothing in the record, however, shows or suggests that proceeding with $8.4 million worth of construction of a $218.9 million project will unduly influence FERC, particularly when more than $18 million has already been spent on the project. On the contrary, the only facts presented on this subject point to a conclusion that FERC will not be influenced and that Virginia Beach has knowingly accepted the risk that $8.4 million of construction could be lost, along with the $18.1 million already spent, if the project is disapproved. In May 1987, FERC issued a Notice of Proposed Rule Making in which it proposed to adopt 40 C.F.R. § 1506.1 and stated:

[Any] applicant that takes steps to further an unapproved project or action and in the process endangers the environment and contravenes the purposes of NEPA, does so at its financial peril because the Commission may withhold or condition its approval. Any argument made by an applicant that its project should be approved because of prior expenditures of funds or resources would be disregarded by the Commission in making its decision on the merits of the proposal.

52 Fed.Reg. 20317 (1987). Through this announcement, FERC has placed applicants on notice that it will not be pressed into approving a project because an applicant has invested a great deal of money in it.

Moreover, in a June 1990 meeting with representatives of FERC, Virginia Beach confirmed that it fully accepted responsibility for the loss of preliminary construction costs if the project were not approved. It specifically communicated an awareness of that risk to FERC. J.A. 141. The knowing acceptance of the risk by Virginia Beach and its communication of the acceptance to FERC function as a protective barrier against any potential political pressure that otherwise might exist.

We recognize that if construction of the entire pipeline up to the border of FERC's jurisdiction were permitted, there may come a point where the construction and the concomitant expenditure of funds would create so much pressure that the completed portions of the pipeline would " 'stand like [a] gun barrel[ ]' " aimed at FERC. *Gilchrist,* 808 F.2d at 1042 (citation omitted). Thus, an injunction that prevents Virginia Beach from completing the *entire* pipeline before FERC has given its approval cannot be said to be invalid even if the construction itself will not violate NEPA.

However, Virginia Beach has not pressed that far with its principal ground for appeal. It seeks to perform relatively minor work on aspects of the pipeline outside FERC's jurisdiction that will save precious time and money if the project is approved. FERC's only interest, and derivatively North Carolina's, is in Project 2009. To argue that any work wherever planned in connection with the project should be enjoined because it unduly influences FERC's decision-making reaches far too broadly to justify the extraordinary writ of injunction, which " 'should be tailored to restrain no more than what is reasonably required to accomplish its ends.' " *Marsh,* 866 F.2d at 100 (quoting *Consolidation Coal Co. v. Disabled Miners of Southern West Virginia,* 442 F.2d 1261, 1267 (4th Cir.), *cert. denied,* 404 U.S. 911, 92 S.Ct. 228, 30

L.Ed.2d 184 (1971)). At some point, the pressure reduces to the level of background noise in the decision-making process.

█ If the rule were such that any construction that could, in even the smallest degree, bring public and political pressure on agencies is prohibited until final agency approval of all aspects of the project, the prohibition would logically extend to any *de minimis* construction. In this case, for example, it might extend even to surveying and unrelated construction which might increase the demand for water. That is not the intended reach of *Gilchrist.* Thus we hold that construction which lies beyond the boundaries of FERC's jurisdiction can be enjoined only when it has a direct and substantial probability of influencing FERC's decision. Against that standard, the reach of the injunction entered here, in prohibiting the two relatively minor phases of construction sought in Virginia Beach's motion to alter or amend, cannot as a matter of law be justified.

Without determining factually those circumstances when direct and substantial pressure would be felt, we reverse the order of the court refusing the amendment sought by Virginia Beach and remand the case for entry of an order permitting commencement of construction of at least the two portions covered by Virginia Beach's motion.

### III

█ Apart from its argument that *Gilchrist* compels an injunction of all work on the Virginia Beach pipeline project, North Carolina also maintains that NEPA requires FERC to assess the environmental effects of all pipeline construction, including any potential effects resulting from construction outside of FERC's immediate decisionmaking jurisdiction. It is argued that until such a review can be conducted by FERC, an injunction of construction on all segments of the pipeline project must issue, because injury to the environment, which North Carolina contends may result from such construction, is irreparable. While we agree that our decisions have favored injunctions when a NEPA review is required and has not been conducted, *see Arlington Coalition on Transp. v. Volpe,* 458 F.2d 1323, 1326 (4th Cir.), *cert. denied,* 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972) (enjoining highway construction pending Department of Transportation review), the issue in this case remains whether the NEPA assessment conducted by the Corps must be repeated by FERC.

The National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4321 *et seq.* (1988) is "our basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a) (1990). To achieve its purposes, NEPA requires federal agencies to consider the environmental implications of any proposed legislation or "major federal action":

The Congress authorizes and directs that, ... (2) all agencies of the Federal Government shall— ... (C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—(i) the environmental impact of the proposed action....

42 U.S.C. § 4332(2)(C). Additionally, FERC's own regulations call for it to conduct NEPA reviews. *See* 18 C.F.R. §§ 380.1–.11 (1990); *cf. Silentman v. Federal Power Comm'n,* 566 F.2d 237, 241 (D.C.Cir.1977) ("It cannot be disputed ... that whether or not an environmental statement is required, the [Commission] must *consider* environmental consequences at every stage of its decision.").

Furthermore, the Council on Environmental Quality, which was established pursuant to NEPA to serve as an advisory body for environmental matters, *see* H.R.Rep. No. 91–378, 91st Cong., 1st Sess. (1969), *reprinted in* 1969 U.S.Code Cong. & Admin.News 2751, has issued regulations to implement 42 U.S.C. § 4332(2)(C). *See* 40 C.F.R. §§ 1500–1517 (1990). Among these regulations is § 1506.1, which provides: "(a) Until an agency issues a record of decision ... no action concerning the proposal shall be taken which would: (1)

[h]ave an adverse environmental impact; or (2) [l]imit the choice of reasonable alternatives." FERC thus must conduct a NEPA review of the environmental impact of any "major federal action" within its jurisdiction. Although we are asked by the parties to assume, without deciding, that FERC's approval constitutes a major federal action, it remains necessary to decide the scope of its NEPA review. That analysis, in turn, must begin with the scope of FERC's jurisdiction, because only an authorized agency action need be examined for its environmental impact.

The Federal Power Act, 16 U.S.C. § 791a *et seq.* (1988), defines the scope of FERC's responsibility with respect to the pipeline project. The Act authorizes FERC, among other things, to issue licenses for "dams, water conduits, ... or other project works necessary or convenient for the development and improvement of navigation and for the transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce...." 16 U.S.C. § 797(e). The Act also provides that

> the Commission, ... whenever it finds that in conformity with a comprehensive plan for improving or developing a waterway or waterways for beneficial public uses all or part of any licensed project should no longer be used or adapted for use for power purposes, may license all or part of the project works for nonpower use.

16 U.S.C. § 808(f). The term "project works" is defined in the Act as "the physical structures of a project," 16 U.S.C. § 796(12), while a "project" is "the complete unit of development of a power plant." *Chemehuevi Tribe of Indians v. FPC,* 420 U.S. 395, 401, 95 S.Ct. 1066, 1071, 43 L.Ed.2d 279 (1975).

Given this authority, the litigants agree that FERC must approve the granting of easements by VEPCO to Virginia Beach prior to construction of any portion of the pipeline across VEPCO lands and prior to withdrawal of water from Lake Gaston. North Carolina argues, however, that, in essence, the necessity of this FERC decision to the completion of the entire pipeline project is sufficient to authorize it to analyze the environmental impact of any work on the entire pipeline project and therefore to require an injunction of all construction until FERC completes its review.

Of first importance is the fact that FERC has no licensing power or veto power over those parts of the pipeline that fall outside of Project 2009 (the hydropower facility at Lake Gaston). *See Chemehuevi,* 420 U.S. at 409, 95 S.Ct. at 1075 (" *'[t]he Commission is limited to consideration of projects designed to produce water power.* Structures or diversions having any other purpose, unless incidental to works constructed for power purposes or a necessary part of a comprehensive scheme of development, are not within [its] jurisdiction.' FPC, First Annual Report 51–52." (emphasis added by Supreme Court)). Indeed, if Virginia Beach were to build a pipeline, or any structure for that matter, up to the edge of Lake Gaston, it is doubtful that FERC would have any say in the matter. FERC has not contributed funds or other assistance to the construction of the Virginia Beach pipeline. *Cf. Arlington Coalition,* 458 F.2d at 1328–1330 (highway constitutes a major federal action when built as part of Federal Interstate Highway system with 90% funding by federal government). In fact, the only federal involvement in the project, aside from FERC's decision regarding the transfers of easements, is that of the Corps, which has already provided an environmental assessment to the fullest extent required by NEPA. *See Roanoke River Basin Ass'n v. Hudson,* 940 F.2d at 66 (4th Cir.1991) (the Corps "properly considered all factors that it was required to consider"). Simply put, NEPA requires agencies of the federal government, not private actors or states and municipalities, to consider the potential effects upon the environment of their proposed actions. Because FERC's responsibility is limited to overseeing only that portion of Virginia Beach's pipeline that directly affects Project 2009, it follows that FERC's NEPA review in this case should have a preclusive effect only on that por-

tion, even if FERC opts to analyze under NEPA the environmental impact of portions of the pipeline beyond its control.[5]

Limiting the effect, but not the scope of FERC's NEPA review to only those portions of the pipeline that lie within FERC's jurisdiction is consistent with the authority exercised by the Corps, which has already performed an environmental assessment pursuant to NEPA. This is not a case in which we are asked to permit construction on property under FERC jurisdiction without a NEPA review; nor has Virginia Beach sought to initiate construction to bypass a NEPA review. On the contrary, it would appear that the parties and FERC agree that FERC will and should conduct a NEPA review in connection with Project 2009. Moreover, for non-Project 2009 property, over which FERC has no jurisdiction, the NEPA requirements were previously satisfied by the Corps. The Corps concluded that because there would be no significant impact on the human environment caused by the project, no EIS was necessary. North Carolina challenged that review, the district court upheld the decision of the Corps, and we affirmed in *Roanoke River Basin*. That issue has now been resolved.

Because a NEPA review has already been conducted by the Corps and FERC's required jurisdiction is limited, the fact that, as North Carolina notes, FERC may choose to conduct a NEPA review beyond its required jurisdiction does not mandate issuance of an injunction, unlike circumstances when a NEPA review is required and has not been conducted or where a supplemental review is required. *Cf. Arlington Coalition*, 458 F.2d at 1330, 1334 (injunction should issue where NEPA review required). Although a review of environmental impact by FERC of areas outside of its required jurisdiction might be desirable, NEPA case law requires only that an agency comply with the "statutory

minima." *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 548, 98 S.Ct. 1197, 1214, 55 L.Ed.2d 460 (1978) (emphasis in original).

We thus conclude that in the particular circumstances presented in this case, where a NEPA review of the pipeline has already been completed properly by the Army Corps of Engineers, FERC's environmental review of the project is binding only on those aspects that lie within the purview of FERC. Until FERC has finished any NEPA review that it will conduct, no construction may begin, for environmental reasons, of those portions of the pipeline that will fall within its jurisdiction and which would "[h]ave an adverse environmental impact" or "[l]imit the choice of reasonable alternatives." 40 C.F.R. § 1506.1(a) (1990). However, any analysis by FERC of aspects of the project that are outside its purview and within the jurisdiction of the Army Corps of Engineers cannot be viewed as overruling the Corps' findings or our decision in *Roanoke River Basin*. Construction of those portions of the pipeline that fall outside of FERC's jurisdiction will not run afoul of the "[l]imiations on actions during NEPA process," 40 C.F.R. § 1506.-1(a), because the NEPA review of those portions has already been completed properly by the Corps.

## IV

Because commencement of the two aspects of construction which Virginia Beach seeks does not have a direct and substantial probability of influencing FERC's decision with respect to Project 2009 and an environmental review of those aspects not within FERC's jurisdiction has already been conducted, we reverse the order of the district court denying the motion to modify the injunction and direct it to permit the commencement of construction of at least the two portions described by Virginia Beach in its motion to alter or amend.

**5.** We are informed that FERC may intend to conduct an environmental assessment of the entire pipeline project prior to rendering its permission to transfer the easements from VEPCO to Virginia Beach. Because we determine that no injunction need issue unless FERC

is *required* by NEPA to conduct such an extensive assessment and that NEPA does not so require, we do not reach the issue of whether FERC *may* rely upon such an assessment in making its decision.

REVERSED AND REMANDED WITH INSTRUCTIONS.

MURNAGHAN, Circuit Judge, dissenting:

I would affirm the district court's decisions to enjoin construction of the pipeline from Lake Gaston to Virginia Beach, pending examination of its environmental impact by FERC, and to deny Virginia Beach's motion to alter or amend the injunction. The majority states that it gives "due regard to the factual findings made by the [district] court" but that it is reviewing "the application of the holding in *Gilchrist*[1] to those facts" as an issue of law to be reviewed *de novo*, maj. at 601–02; however, I believe that the majority does more than merely review application of the *Gilchrist* holding. The Court today actually changes the legal standard applied by us and other courts in a way which, I believe, is inappropriate.

When a district court balances the hardships in considering whether to issue an injunction, we accept the district court's factual findings unless they are clearly erroneous. *South Carolina Dep't of Wildlife & Marine Resources v. Marsh*, 866 F.2d 97, 99 (4th Cir.1989); *Capital Tool & Mfg. Co. v. Maschinenfabrik Herkules*, 837 F.2d 171, 173 (4th Cir.1988). Since the district court correctly interpreted the law and properly applied the law to the facts, I would review the district court's factual findings under the "clearly erroneous" standard and not conduct a *de novo* review. The district court's balancing of the factors and decision to grant or deny an injunction is to be reversed only upon a showing of an

abuse of discretion. *Marsh*, 866 F.2d at 99–100. The district court did not abuse its discretion; therefore, the court's decisions to issue the injunction and to refuse to alter it should not be disturbed on appeal. *See Quince Orchard Valley Citizens Ass'n v. Hodel*, 872 F.2d 75, 78 (4th Cir. 1989).

## I.

In concluding that FERC's examination of the impact of the pipeline project on the environment, pursuant to the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332 (1988), "should have a preclusive effect" only on the portion of the pipeline within its jurisdiction, the majority states: (1) FERC only has "licensing power or veto power" over the portion of the project which would fall within Project 2009 (the Lake Gaston hydropower project), so, therefore, Virginia Beach could likely build a pipeline up to the edge of Lake Gaston without FERC approval; (2) the authority of Virginia Beach to build up to the edge of Lake Gaston without FERC approval stems in part from the lack of any FERC funding for or assistance with any portion of the pipeline outside Project 2009;[2] (3) FERC is only required under NEPA to consider the environmental impact of its own actions, *i.e.*, overseeing the portion of the pipeline project "that directly affects Project 2009." *See* maj. at 604.

But to segment the problem into parts and to consider who has direct authority for each, standing alone, overlooks the spillover effect of one part on another part, *i.e.*, their interrelationship. For the majori-

---

**1.** *Maryland Conservation Council, Inc. v. Gilchrist*, 808 F.2d 1039 (4th Cir.1986).

**2.** At this point in the discussion about the limited effect of the NEPA review to be conducted by FERC, the majority mentions that the only federal involvement in the pipeline outside of Project 2009 is that of the Army Corps of Engineers, and notes that the Corps already has *performed an environmental review deemed by the district court and the Fourth Circuit to be sufficient under NEPA. See* maj. at 605 (citing *Roanoke River Basin Ass'n v. Hudson*, 940 F.2d 58 (4th Cir.1991)). However, the logical relationship between the fact of the Corps' environ-

mental review and the limited effect of FERC's NEPA review is only drawn *after* the majority concludes that FERC is not required to review the impact of the pipeline beyond the limited area of its own direct jurisdiction. The majority states that such a conclusion "is consistent with" the fact that the Corps conducted an environmental review which was upheld by the courts as sufficient to satisfy the obligations of NEPA. Notably, however, the majority's conclusion that the effect of FERC's environmental review is limited to the area within its direct jurisdiction is not made *dependent* on the fact that a NEPA review was already performed by the Corps. *See* maj. at 605.

ty to emphasize the fact that FERC has no authority to prevent Virginia Beach from building over eighty miles of pipeline, with a pumping station, extending directly up to the boundary of the Lake Gaston hydro-power project operated by VEPCO under a license from FERC, is to underscore the principal reason why courts are sometimes called upon to enjoin activities of which only a portion requires a particular federal agency's approval. In *Maryland Conservation Council, Inc. v. Gilchrist*, 808 F.2d 1039, 1042 (4th Cir.1986), we explained that an injunction may be necessary to prevent a non-federal actor from presenting a federal agency with a *fait accompli*. The highway at issue in *Gilchrist* had inevitably to cross a park which had been established with federal funds, and had almost certainly to cross wetlands within the park, for which federal approvals would be required. We reasoned that compliance with NEPA was mandatory before *any* portion of the highway, federally funded or not, could be constructed, regardless of the existence or non-existence of federal authority. *Id.* However, disputed issues of fact remained as to, for example, whether the roads which were under construction prior to completion of the NEPA review were necessarily to be part of the highway through the park, or were to be constructed for access to nearby subdivisions irrespective of whether the federal approvals were granted. Therefore, we remanded to the district court for further factual findings as to "whether any part of the County's construction program is essential for access to the land, as the County claims, and whether the program in fact violates

NEPA and its regulations by limiting 'the choice of reasonable alternatives' available to federal decision-makers. 40 C.F.R. § 1506.1(a)(2) (1985)." *Gilchrist*, 808 F.2d at 1043.

Even agreeing with the majority's conclusion that FERC's obligation under NEPA is limited to consideration of the environmental effects of the project directly within its jurisdiction, I would nevertheless conclude that the district court's decision to issue the injunction was proper. Under *Gilchrist*, no part of the pipeline should be constructed which will present a federal agency with a *fait accompli* in considering portions within its jurisdiction, if it harms the environment or limits the reasonable alternatives. *See also Arlington Coalition on Transp. v. Volpe*, 458 F.2d 1323, 1333 (4th Cir.), *cert. denied*, 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972) ("If investment in the proposed route were to continue prior to and during the Secretary's consideration of the environmental report, the options open to the Secretary would diminish, and at some point his consideration would become a meaningless formality"). In the instant case, not only had FERC not yet granted approval for the construction of an intake facility and withdrawal of 60 million gallons of water per day, but Virginia Beach had intended to commence construction of the pipeline before an application was even submitted to FERC to begin the approval process.[3] Moreover, North Carolina has contended both that the construction of the pipeline across federally protected wetlands will harm the environment and that

---

3. North Carolina has argued that FERC must consider the proposed change in the Lake Gaston project as an amendment to VEPCO's license under 16 U.S.C. § 803(a)(1) and 18 C.F.R. § 4.200. In contrast, Virginia Beach has argued that FERC need only approve the conveyance of easements from VEPCO to Virginia Beach. Nonetheless, both parties agree that FERC approval is required, and we have been asked by both parties to assume that such approval is a "major Federal action" requiring compliance with NEPA mandated environmental reviews.

Virginia Beach has stated that it attempted to initiate the FERC application process in 1984 after the Corps issued its permit, but that

VEPCO refused to initiate the application until the district court affirmed the Corps permit. When this matter came before the district court on December 6, 1990, Virginia Beach and VEPCO were in the process of preparing an Application for the NonProject Use of Project Lands and Waters for VEPCO to complete and file. Upon FERC's recommendation, Virginia Beach and VEPCO had prepared a draft environmental report and submitted it to various federal, state and local agencies for comments. Although the application to FERC had not been filed, Virginia Beach had awarded two of eleven construction contracts, one for six overhead river crossings and one for 6.9 miles of pipeline. The district court issued its injunction on the

construction prior to FERC's approval forecloses options by locking in the design and route of the pipeline and by pressuring FERC to approve the project.

However, I am not persuaded that we are the appropriate body to determine that the effect of FERC's review should be limited to the portion of the project under its direct jurisdiction. FERC announced in the Federal Register that it is required to consider not only that part of a project planned to be undertaken within its area of jurisdiction, but that it must examine the environmental impact of those portions of a project which are not directly within its own jurisdiction:

> When [FERC] considers the environmental impact of a project subject to its jurisdiction, it also considers the environmental impact of nonjurisdictional facilities which are to be constructed with, or are an integral part of, the project involving jurisdictional facilities. [FERC] does this because [FERC] precedent, case law, and the CEQ [Council on Environmental Quality] regulations require [FERC] to consider the environmental impact of an entire project when considering whether to approve the portion of the project under the jurisdiction of [FERC].... [FERC] does not intend to exercise jurisdiction over nonjurisdictional facilities and is not using this process to exercise such jurisdiction. However, to ignore the environmental impact of these facilities when they are an integral part of an entire project that includes jurisdictional facilities would be to take too narrow a view of [FERC's] NEPA responsibilities.

Regulations Implementing National Environmental Policy Act of 1969, 52 Fed.Reg. 47897, 47094 (Dec. 17, 1987) (footnote omitted). While the majority of the pipeline would be outside of the area in which FERC exercises jurisdiction, clearly it is "to be constructed with" or is "an integral part of" the project over which FERC would exercise jurisdiction, the intake facility at Lake Gaston and the initial portion of the pipeline. Thus, review of the entire pipeline would appear to be part of FERC's

responsibility under NEPA, absent any prior environmental review by the Corps of Engineers. The question, then, focuses on the extent to which FERC may or must rely on the environmental assessment conducted by the Corps in fulfillment of its own obligations.

Under the majority's position, FERC is, in effect, absolutely bound by the environmental review conducted by the Corps, even though it dispensed with as unnecessary an environmental impact statement. While the nature of the environmental review may be left to the Corps to determine in the first instance, it will not be the last. North Carolina has contended that the environmental review which FERC is obligated to undertake differs significantly from the environmental assessment conducted by the Corps. First, under the Federal Power Act, FERC has a special duty to consider the impact of the project on the development of hydropower. See 16 U.S.C. § 803(a)(1) (1988) (FERC obliged to consider whether the proposed project is consistent with "a comprehensive plan ... for the improvement and utilization of water-power development, for the adequate protection, mitigation, and enhancement of fish and wildlife (including related spawning grounds and habitat), and for other beneficial public uses, including irrigation, flood control, water supply ...". Although the environmental assessment conducted by the Corps took account of various increased water uses, it did not include consideration of increased water use due to several proposed power plants in the Roanoke River Basin, one of which is already under construction. North Carolina has argued that consideration of the additional water usage due to the power plants and the pipeline's impact on hydropower generation is incumbent upon FERC.

Second, an environmental review by FERC appears to require consideration of other developments which have occurred since the Corps conducted its review. The majority of the review undertaken by the Corps was conducted in 1983.[4] Upon court

---

day that construction was scheduled to begin, December 10, 1990.

**4.** The Corps report concludes that "no significant effects" on any of the following conditions

order, the Corps in 1988 reconsidered only certain impacts of the pipeline.[5] North Carolina has maintained that significant developments which have occurred since the Corps' environmental assessment was performed, and which must be considered by FERC, include (1) changes in federal wetlands regulation, such that the area of wetlands affected by the pipeline has nearly doubled and the protections accorded to wetlands has increased; and (2) changes in population, land use, and water use which require analysis of water quality in the Roanoke River, including the river's capacity to assimilate pollution if 60 million gallons per day are withdrawn.

Third, while the Corps concluded in its environmental assessment that preparation of the more extensive environmental impact statement was not necessary because the project would have no significant impact on the quality of the human environment, several state and federal agencies have indicated their positions that FERC is obligated to prepare an environmental impact statement before deciding whether to approve the project.[6] Our review of the Corps decision not to prepare an environmental impact statement was "limited to a determination of whether the Corps' decision was 'arbitrary, capricious, otherwise not in accordance with law, or unsupported by substantial evidence.'" *Roanoke River Basin Ass'n v. Hudson*, 940 F.2d 58, 61 (4th Cir.1991) (quoting 5 U.S.C. § 706(2)). Thus, the conclusion in the Corps' environmental assessment that the project would not so significantly affect the human environment, such that a more searching study of its impact would have been necessary, would not necessarily be the conclusion of

FERC when its approval is finally sought over eight years later.

The principle that a federal agency is not permitted to rely upon another agency's examination of an action's environmental effects to fulfill its obligations under NEPA is well-established. *See The Steamboaters v. FERC*, 759 F.2d 1382, 1393–94 (9th Cir.1985); *Southern Oregon Citizens Against Toxic Sprays, Inc. v. Clark*, 720 F.2d 1475, 1480 (9th Cir.1983), *cert. denied*, 469 U.S. 1028, 105 S.Ct. 446, 83 L.Ed.2d 372 (1984); *Oregon Environmental Council v. Kunzman*, 714 F.2d 901, 905 (9th Cir.1983); *Steubing v. Brinegar*, 511 F.2d 489, 496 (2d Cir.1975); *Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n*, 449 F.2d 1109, 1123 (D.C.Cir.1971). An agency with an obligation under NEPA "must independently assess the consequences of a project." *Steamboaters*, 759 F.2d at 1394. Courts have yet to consider the extent to which one agency is permitted to rely on the judgmental decisionmaking involved in the environmental analysis undertaken by another agency when the other agency's environmental assessment was upheld by a court as sufficient to satisfy its obligations under NEPA. However, the underlying principle enunciated by the case law suggests that a court should not determine in the first instance that an agency is bound by the environmental assessment of another agency under the circumstances presented here. An agency may not rely upon the certification by another agency that its environmental standards were met because certification of standards necessitates a different kind of judgment than the type of judgment required by NEPA; a NEPA

could be anticipated: navigation, flooding, hydrology, water quality, wetlands, fish and wildlife, erosion and accretion, food and fiber production, recreation, cultural values, aesthetics, energy needs, water supply or socioeconomics.

**5.** The Supplemental Statement of Findings prepared by the Corps addressed effects of the pipeline and diminished water flow on the striped bass downstream of Lake Gaston and the extent of Virginia Beach's water needs.

**6.** In their comments upon the Virginia Beach/ VEPCO draft environmental report, the following agencies stated that FERC should conduct further studies and prepare an environmental impact statement before granting approval of the pipeline project: the Fish and Wildlife Service of the United States Department of the Interior; the National Marine Fisheries Service of the United States Department of Commerce; and the Division of Marine Fisheries, the Division of Water Resources, and the Division of Environmental Management, all of the Department of Environment, Health, and Natural Resources of the State of North Carolina.

judgment requires the weighing of a particular project's environmental costs against its benefits. *Calvert Cliffs'*, 449 F.2d at 1123. While the Corps undertook the type of NEPA judgment which involved a weighing of the environmental costs against the pipeline's benefits the balancing analysis which FERC is obligated to undertake is different; it may include a statutory obligation to consider the impact on hydropower, preparation of an environmental impact statement, and consideration of the changed circumstances inherent in conducting its review more than eight years after the majority of the Corps' review was performed. Therefore, the extent to which FERC determines that it is prudent to rely on the Corps' findings, and the extent to which FERC determines that additional studies are necessary, are matters which should be left to FERC to decide in the first instance.[7]

The decision of the district court to enjoin construction of the pipeline, pending FERC's performance of its environmental review, properly preserved the opportunity for FERC to consider the environmental impact of the pipeline. The court, in its December 10, 1990 order, applied the four-part test of *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189, 196 (4th Cir.1977), as follows: (1) the irreparable harm to North Carolina if an injunction was not issued would be the construction of the pipeline prior to FERC's conducting its own independent evaluation of the project's environmental impact, and thus without FERC's approval for the transfer of easements permitting construction of the intake facility and withdrawal of the water from Lake Gaston; (2) the harm of any delay in building the pipeline cited by Virginia Beach could not be attributed to issuance of an injunction due to other pending matters which might cause that particular harm; (3) the likelihood of success on the merits relates to the likelihood that plaintiffs would prevail in the request for a permanent injunction prohibiting construction pending FERC's review, not to the likelihood that FERC's decision would

differ from that of the Corps; (4) the public interest in initiating construction immediately was unclear, since it could not be determined how much time would in fact be saved; however, "the public interest in a FERC decision uninfluenced by the vast expenditures of public funds and a partial completion of the project outweighs any anticipated delay. The public interest favors avoiding irreversible damage to the environment. . . ."

In its analysis of the harm which would ensue if construction were not halted, the district court correctly interpreted our decisions in *Maryland Conservation Council, Inc. v. Gilchrist*, 808 F.2d 1039 (4th Cir. 1986), and *South Carolina Department of Wildlife & Marine Resources v. Marsh*, 866 F.2d 97 (4th Cir.1989). The district court's interpretation of the law was correct, and the findings cannot be deemed to be clearly erroneous. I would affirm the decision to enjoin construction of the pipeline pending approval by FERC. While approval is on one side ultimately quite possible, allowing construction to proceed prior to approval may as a practical matter foreclose refusal for what has become a *fait accompli*. The intent of Congress that FERC's decision be fully unbiased would be frustrated.

## II.

In overturning the district court's refusal to amend the injunction, the majority sets forth a new standard for determining whether construction of those portions of a public works project which lie beyond the jurisdiction of a federal agency should be enjoined pending completion of the federal agency's environmental review pursuant to NEPA. The majority examines the record for facts demonstrating a "direct and substantial probability" that the construction of six overhead river-crossings and part of a pump station would influence FERC's decision. *See* maj. at 603. In concluding that nothing in the record indicates that this construction would influence FERC's

---

7. At the very least, an application should have been made to FERC to determine the extent to

which it accepts, in lieu of its own efforts, the study by the Corps, and will be bound thereby.

decision, the majority cites the following factors: (1) Virginia Beach stated that it was willing to forego the $8.4 million it would expend on this phase of construction, and thus "knowingly accepted the risk" that FERC might refuse to approve the project;[8] (2) FERC announced in the Federal Register that expenditures prior to approval of a project will not influence its decisionmaking; (3) the project involves a "relatively minor" expenditure of $8.4 million,[9] yet would save significant time and expense for Virginia Beach if begun in advance. *See* maj. at 603–04.

After discussing the factors, the majority engages in a flawed argument. First, the majority misstates the current rule; then claims that the rule, as so misstated, logically leads to absurd results; and then issues its new standard. Specifically, the majority states: "If the rule were such that any construction that could, in even the smallest degree, bring public and political pressure on agencies is prohibited until final agency approval of all aspects of the project, the prohibition would logically extend to any *de minimis* construction." Maj. at 603. Then the majority shows an absurd result of its misstatement of the current standard: "In this case, for example, it might extend even to surveying and unrelated construction which might increase the demand for water. That is not the intended reach of *Gilchrist*."[10] *Id.* Finally, the majority announces its new standard: "Thus we hold that construction which lies beyond the boundaries of FERC's jurisdiction can be enjoined only when it has a direct and substantial probability of influencing FERC's decision."[11] Maj. at 603. Applying such new standard, the majority concludes: "Against that standard, the reach of the injunction entered here, in prohibiting the two relatively mi-

nor phases of construction sought in Virginia Beach's motion to alter or amend, cannot as a matter of law be justified." Maj. at 603.

While it may be impossible to express our approach in a pithy statement, the proper "rule," which I advocate, clearly is not that "any construction that could, in even the smallest degree, bring public and political pressure on agencies is prohibited until final agency approval of all aspects of the project...." *See* maj. at 603. The analysis which the Fourth Circuit has developed instead is more akin to the regulations adopted by the Council on Environmental Quality to implement NEPA; the factors we have considered focus more closely on the elements adopted by the regulation which prohibits actions prior to compliance with NEPA which would "[h]ave an adverse environmental impact" or "[l]imit the choice of reasonable alternatives." *See* 40 C.F.R. § 1506.1(a) (1990); *see also South Carolina Dep't of Wildlife & Marine Resources v. Marsh*, 866 F.2d 97 (4th Cir.1989); *Maryland Conservation Council, Inc. v. Gilchrist*, 808 F.2d 1039, 1042 (4th Cir.1986); *Arlington Coalition on Transp. v. Volpe*, 458 F.2d 1323 (4th Cir.), *cert. denied*, 409 U.S. 1000, 93 S.Ct. 312, 34 L.Ed.2d 261 (1972).

Construction, whether *de minimis* or not, which would demonstrably neither adversely affect the environment nor limit the available choices, even if it would bring pressure on the agency, would not necessarily be enjoined under the standard set by those precedents. *See, e.g., Marsh*, 866 F.2d at 100 (installation of generators permitted even though plaintiff contended that expenditures would foreclose the agency's options, in part because plaintiffs conceded that installation would have no adverse en-

---

**8.** For such a politically charged and expensive undertaking, complete obedience to Virginia Beach's acceptance of the risk, without doubting the good faith of the undertaking when made, is questionable.

**9.** But is $8.4 million, accompanied by $18.1 million already spent, truly a relatively minor expenditure?

**10.** No such extension is here involved. Moreover, nothing in our previous decisions suggests that an injunction would extend to any activity beyond either the proposed project itself or integral parts of the overall project—a logical and easy line to draw.

**11.** Again the question presents itself: Why has no attempt adequately to learn FERC's own position on the subject been made?

vironmental impact). And yet the majority's new standard, involving a search for evidence that pre-approval construction would have a "direct and substantial probability" of influencing FERC's decision, fails adequately to account for those two considerations.

Furthermore, even were I to conclude that the majority's standard was proper, I would nonetheless remand to the district court for the requisite findings of fact in light of the new standard. I find that the majority accepted too readily the claim of factors which supposedly indicate that FERC's decision will not be prejudiced by construction of the pipeline. For example, the majority relies on FERC's statement in a Notice of Proposed Rulemaking that it would not be influenced by pre-approval expenditures. *See* maj. at 601–02 (discussing 52 Fed.Reg. 20317 (1987)). In context, however, the warning appears in a different light. The statement appears in a discussion about the intent and language of regulations proposed by the Council on Environmental Quality. FERC first noted that under the proposed regulation, appearing now at 40 C.F.R. § 1506.1(a) (1990), any steps undertaken prior to FERC's approval of a proposal which would limit the choice of reasonable alternatives or have an adverse environmental impact would be *prohibited*, not merely disregarded. A commentator contended that FERC lacks authority to prohibit an otherwise lawful act occurring outside its jurisdiction. In response, FERC stated that it "can act directly or indirectly to enjoin or otherwise stop unauthorized activities *directly related* to a project or action within its jurisdiction." 52 Fed.Reg. 20317 (emphasis supplied). Thus, FERC exhibited an intent to prevent a project from going forward prior to FERC's compliance with NEPA-mandated environmental reviews, including those portions of the project falling outside its direct jurisdiction. FERC then stated that, in the process of approving a project, it would disregard any argument that a project should be approved because of pre-approval expenditures, *id.*, an expression of attitude which has some of the aspects of whistling in the dark. Clearly, the overall goal of

FERC as expressed in the statement is to prohibit actions prior to approval which would limit its reasonable alternatives or have an adverse environmental impact. Moreover, that the $8.4 million, on top of the $18.1 million already spent, would be rendered of little or no value raises a weighty political argument against the likelihood that FERC would disregard pre-approval expenditures.

Similarly, the majority accords undue weight to the declaration by Virginia Beach that it is willing to forego its investment of such a large amount in the pipeline in the event that FERC does not approve the project. The notion of what it means to pressure a decision by limiting an agency's alternatives or foreclosing its options, once so much in the way of resources has been committed by the agency itself or by another party, should be applied in a way which better takes into account the reality of bureaucratic decisionmaking. *See, e.g., Sierra Club v. Marsh*, 872 F.2d 497, 504 (1st Cir.1989) (taking account of "the psychology of decisionmakers," the "difficulty of stopping a bureaucratic steam roller," and the "deeply rooted human psychological instinct not to tear down projects once they are built"); *Realty Income Trust v. Eckerd*, 564 F.2d 447, 456 (D.C.Cir.1977) (injunctions prior to compliance with NEPA "preserve for the agency the widest freedom of choice.... Behind the insistence on preserving the status quo for the agency, even at the costs of an injunction, is the shared assumption by the courts that *they should not prejudge* the reconsiderations that agencies will make once the full environmental consequences of the action have been determined") (emphasis in original).

I conclude, consequently, that the district court correctly denied the motion to alter or amend the initial injunction. Virginia Beach has contended that the district court misread our decision in *Marsh* and thus mistakenly placed undue emphasis on the amount of the expenditures and the potential to pressure FERC's decision. The district court in its order of January 4, 1991 did state that the expenditures were a

factor in its decision to deny the motion to alter or amend the injunction:

As this court interprets *Gilchrist,* federal regulatory agencies, such as FERC, should not be presented with public and political pressure brought on by partially completed projects in making important environmental decisions under the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.* Defendant has already spent $18.1 million on this project. Although $8.4 million may be a small part of the total $218.9 million price, it at least becomes *more significant* when added to the $18.1 million already spent.

(Emphasis in original). However, unlike in *Marsh,* where we found that the pressure which may be created by expenditures on installation of generators prior to compliance with NEPA was insufficient to warrant an injunction in the absence of any detrimental impact on the environment, *see Marsh,* 866 F.2d at 100, the district court in the instant case had already found that construction of the initial phases of the pipeline would cause irreparable environmental harm. *See* Order of the District Court of December 10, 1990.

Therefore, I respectfully dissent and would affirm both decisions of the district court.